

* 1 0 6 1 1 7 8 8 6 8 *

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

FEB 27 2025

RICK WARREN
COURT CLERK

136

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

|  |  |  |
|---|---|---|
| KALLIE HUMPHREYS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CJ-2024-7141 |
| | ) | (*Honorable Sheila Stinson*) |
| OU MEDICINE, INC d/b/a OU HEALTH, | ) | |
| EMERGENCY PHYSICIANS OF MIDWEST | ) | |
| CITY, LLC, and | ) | |
| MICHAEL KALCICH, MD, Individually, | ) | |
| STEFANIE BEAVERS, Individually, | ) | |
| TRACEY KISEAU, Individually, | ) | |
| | ) | |
| Defendants. | ) | |

### FIRST AMENDED PETITION

**COMES NOW**, the Plaintiff, Kallie Humphreys, by and through her attorney of record, Blair S. Hollaway of Blair Law, and for her cause of action against Defendants, Plaintiff alleges, and states as follows:

### JURISDICTION AND VENUE

1.      Plaintiff, Kallie Humphreys, currently and, at the time of the events complained herein, is a citizen of the State of Oklahoma.

2.      Defendant OU Medicine, INC d/b/a OU Health ("OUH") is a not-for-profit corporation doing business in the State of Oklahoma.

3.      Emergency Physicians of Midwest City ("EPMC") is a limited liability company doing business in Oklahoma County.  EPMC is the sole provider of OUH's professional emergency room care. EPMC does not have any contracts with other facilities. OUH is aware of this.

4.      Defendant Michael Kalcich is believed to be a resident Oklahoma County.

**EXHIBIT**

tabbies*

**4**

5.      Defendant Stefanie Beavers is believed to be a resident of Oklahoma County.

6.      Defendant Tracey Kiesau is believed to be a resident of Oklahoma County.

7.      The events that give rise to this lawsuit occurred substantially in Oklahoma County, Oklahoma.

## STATEMENT OF FACTS

8.      Paragraphs 1-7 are incorporated herein by reference.

9.      Plaintiff worked as a physician assistant ("PA") for EPMC. EPMC serves as the sole medical provider for Defendant, OU Health's ("OUH"), emergency departments and did not provide medical services to any other healthcare institutions. All physicians and advanced practice providers ("APPs") are employed by EPMC. Plaintiff alleges OUH and EPMC are joint employers of Plaintiff.

10.     EPMC held a contract, or professional service agreement, with OUH. At all times during the events giving rise to this lawsuit, OUH did not have a direct contractual relationship with the providers employed by EPMC. The service agreement existing between OUH and EPMC was secured on the condition that all EPMC employees would be hired by OUH, as OUH's aim was employment of one hundred percent of medical providers providing services within their facilities. OUH exercised significant control over Plaintiff and all EPMC providers. This control included issuance of OUH name badges and OUH email addresses, issuance of OUH cell phones for institution wide communication while on shift, enforcement of OUH's policies and procedures, enforcement of mandatory attendance and completion of OUH training modules and in-person classes, enforcement of mandatory yearly vaccination compliance, and retention of the ultimate right to terminate employment. Furthermore, OUH had the final authority over staffing decisions in the emergency department.

11.    During the timeline that gives rise to this lawsuit, EPMC and OUH were engaged in the previously mentioned transition from EPMC employees to OUH employees.

12.    The transition of EPMC employees to OUH employees was far from smooth. Initially slated for January 1, 2024, the merger was postponed to May 2024 and then further delayed to January 1, 2025.   OUH failed to provide timely compensation and benefit information to EPMC's providers.  The continual delays and uncertainties regarding OUH's acquisition of EPMC employees resulted in significant angst and turmoil amongst providers. In response to these issues, EPMC's Chief Executive, Dr. Michael Kalcich, M.D., requested Plaintiff's involvement in meetings with OUH APP executive leadership to discuss the transition process and advocate on behalf of the EPMC APPs.  At all times, Plaintiff was operating under the direction of Dr. Michael Kalcich.

13.    During the five-month period in which Plaintiff was involved in the transition process, Plaintiff participated in two meetings with Dr. Michael Kalcich and OUH executives. Following each meeting, Plaintiff sent a follow up email to executives, outlining the shared concerns of both her and Dr. Michael Kalcich surrounding the future APP compensation package.

14.    On or about March 3, 2024, OUH introduced and began implementing its new compensation plan for APPs already employed by the organization.  As those APPs began voicing their concerns and dissatisfaction, it became clear to Plaintiff that the main objective of OUH's new compensation plan was to increase the number of hours worked by each employee while simultaneously reducing APP compensation.  The plan illegally misclassifies APPs as salaried employees, which is advantageous for OUH as it enables Defendant to maintain a fixed budget for APP salaries.  In addition, this allows OUH to exploit APPs for

free labor. It is important to acknowledge distinct characteristics of shifts in emergency and inpatient medicine. APPs employed in these settings work shifts that have highly variable patient volumes and acuity levels and are often at the mercy of other providers and their individual workloads, which in turn, often requires them to work beyond the end of their scheduled shift. The notion that a physician assistant, registered nurse, or advance registered nurse practitioner could leave precisely when their shift is scheduled to end is unrealistic and preposterous. It is important to mention that registered nurses were not part of this compensation plan, even though they, like APPs, work a shift-based schedule.

15.    Beyond exploiting free labor, paying APPs a salary instead of hourly wages relieves OUH of their obligation to pay overtime. The new compensation plan that was implemented is essentially a sham salary, where the salary offered is based on hours worked. This clearly violates the Fair Labor Standards Act ("FLSA").

16.    Certain professions, such as "lawyer" and "medical doctor," are exempt from the Department of Labor's salary basis test. This test is used to determine whether an employee is truly paid on a salary basis rather than an hourly basis. If a court determines that an employee is effectively paid hourly while supposedly receiving a "salary," the employer is liable under the Fair Labor Standards Act for the misclassification and unpaid wages and overtime owed to the misclassified employee. Professions like Medical Doctor, Lawyer, Dentist, and Veterinarian have all been determined by the Department of Labor to be exempt from Salary Basis, and therefore is never owed overtime. Court's have considered whether Physician Assistants and Nurse Practitioners are also exempt, and those Courts have consistently held that Physician Assistants and Nurse Practitioners ARE NOT exempt from the salary basis test.

4

See *Belt v. Emcare*, 444 F.3d 403 (5th Cir. 2006) This makes OUH's salary initiatives toward their APPs illegal.

17.    Oklahoma maintains a public policy against violations of the Fair Labor Standards Act and employee misclassification, as outlined in Title 40 of Oklahoma Statutes. This section of the law includes the establishment of the Oklahoma Employment Security Commission ("OESC"). Specifically, Title 40 § 4-509 addresses this policy as follows:

"COMMISSION TO COOPERATE AND COMPLY WITH FEDERAL LAW. In the administration of this act, the Oklahoma Employment Security Commission shall cooperate to the fullest extent consistent with the provisions of this act, with the Social Security Act, as amended, and is authorized and directed to take such action, through the adoption of appropriate rules, administrative methods and standards, as may be necessary to secure to this state and its citizens all advantages available under the provisions of such act, under the provisions of Sections 1602 and 1603 of the Federal Unemployment Tax Act and under the provisions of the Act of Congress entitled "An Act to provide for the establishment of a national employment system and for cooperation with States in the promotion of such system, and for other purposes", approved June 6, 1933, as amended. The Commission shall comply with the regulations of the Secretary of Labor relating to the receipt or expenditure by this state of monies granted under any of such acts and shall make such reports, in such form and containing such information as the Secretary of Labor may from time to time require, and shall comply with such provisions as the Secretary of Labor may from time to time find necessary to assure the correctness and verification of such reports. The Commission may afford reasonable cooperation with every agency of the United States charged with the administration of any unemployment insurance law."

18.    The OESC conducts investigations to ensure compliance with its own state regulations, Title 40, and the Fair Labor Standards Act ("FLSA"). The OESC reports any FLSA violations, such as misclassification of salaried employees, to the Department of Labor. Oklahoma has a strong public policy against employers who misclassify employees for financial gain.  To reinforce this policy, the OESC and the Department of Labor issued a

Memorandum of Understanding, affirming their collaboration to identify violations of both Oklahoma and federal laws. This agreement was issued on April 1, 2022, and renewed for five years.

19.    Following the final meeting with OUH executives, on or about April 29, 2024, Dr. Michael Kalcich and Plaintiff collaborated and sent an email to OUH executive leadership, including the superiors of those responsible for the development and presentation of the compensation plans for EPMC providers. The email outlined the industry standard for emergency medicine APPs was hourly wages and cautioned a salary-based compensation plan could have a detrimental or even catastrophic impact on OUH's retention of current APPs. While Plaintiff's objections were overly cordial, she emphasized that OUH's compensation plan did not align with industry standards, and in her opinion, was unfair to APPs. According to the OESC, Oklahoma employers are obligated to pay all wages owed to its employees, which includes any amounts owed due to misclassification.

20.    Plaintiff holds a sterling reputation among her peers. In fact, Dr. Michael Kalcich, M.D. and EPMC co-owner, Dr. Michael Padgham, M.D., have consistently affirmed Ms. Humphreys to be an exemplary employee and physician assistant.

21.    On information and belief, OUH's Chief Nursing Executive, Stefanie Beavers ("Beavers"), and Interim Chief for Advanced Practice Providers, Tracey Kiesau ("Kiesau"), were enraged by Plaintiff's email which was also distributed to their superiors. On information and belief, Beavers contacted Dr. Michael Kalcich to arrange a phone call with Plaintiff to discuss Plaintiff's email.

22.    Beavers initiated a personal phone call with Plaintiff where she was condescending, intimidating, and unprofessional. This call served to silence and prevent

Plaintiff from further communicating the collective concerns of EPMC APPs. Following the brief call, Beavers launched a campaign to have Plaintiff's contract terminated and deliberately sought to blacklist Plaintiff from EPMC, as well as her anticipated employment with OUH. As part of this deliberate scheme to harm Plaintiff's reputation, Beavers knowingly made false statements about Plaintiff. This was done in retaliation for Plaintiff pointing out that OUH was not following industry standards. More importantly, Plaintiff's reasoning was adjacent to the law concerning employee misclassification. Whether OUH understood it was, or could be, violating the FLSA is not known.

23.     Following the phone call with Beavers, Plaintiff sent text messages to Dr. Michael Kalcich noting Beavers spoke to her "condescendingly" and expressed she had never been "approached with the intimidation tactics she (Beavers) used." This is crucial evidence highlighting Beavers' leadership style which relies on fear and intimidation to achieve her objectives.

24.     Mary Daniel, associate general counsel for OUH, has stated Plaintiff is permitted to work as an employee of OUH. This statement has proved to be a lie. Upon Ms. Daniel's instruction, Plaintiff applied for the publicly advertised Adult Emergency Department APP position. On information and belief, the Director of Advance Practice Providers for Adult Services, Justin Horne, was instructed to abort the hiring process of Plaintiff despite EPMC's inability to fully staff the ED with APPs at that time.

25.     As a result of OUH's demands, Plaintiff has been blacklisted from EPMC due to the egregious conduct of Beavers and other OUH executive leadership.

26.     OUH maliciously manufactured false and damaging statements, ultimately forcing EPMC to terminate the contract of an outstanding and highly valued employee with whom they contracted for over 11 years.

27.     OUH knew it did not have privity of contract.[1]  OUH knew its actions were wrong, and OUH knew its conduct was tortious.

28.     OUH took the fabricated lies of Beavers and her associate, Tracey Kiesau, who on information and belief, was acting under Beavers' direction, and crafted a letter on official OUH letterhead, formally demanding EPMC's termination of Plaintiff's longstanding employment.

29.     This letter was drafted by Casey Woods, Chief Administration Officer on May 8, 2024.  On information and belief, Mr. Woods has been fired from OUH.  The circumstances of his termination are not known but will be sought in this lawsuit.

30.     In the letter, Mr. Woods demands the immediate removal of Ms. Humphreys, claiming she "demonstrated a pattern of unprofessional and inappropriate behavior" toward executive leadership.  Mr. Woods knew this assertion was false when he wrote it and knew that documentation to support such a claim did not exist.  It is especially ironic that Mr. Woods accuses Plaintiff of behavior commonly acknowledged as a characteristic of Stefanie Beavers and Tracey Kiesau.  According to statements from EPMC, Mr. Woods approached OUH executives (believed to be Beavers and Kiesau), arguing actions taken against Ms. Humphreys were unjustified, and expressed his disagreement with the removal of Ms. Humphreys from all

---

[1] OUH's legal counsel, Mary Daniel, esq., sent an email and had a subsequent phone conversation with Plaintiff's counsel. In that email, Ms. Daniel admits to three of the five elements for tortious interference of contract. Thus, leaving only the justifiable nature of OUH's actions and the damages sustained by Plaintiff as the only remaining elements for Plaintiff to show the court (by OUH's own admission).

OUH facilities. Despite his objections, he was overruled and ordered to publish a letter founded on false statements.

31.    He states, "the last day of onsite performance will be today, (May 8, 2024)." He further states Plaintiff should voluntarily resign her privileges.[2] Mr. Woods states Plaintiff should resign her privileges because "she will no longer be providing services to OUH."

32.    Mr. Woods references paragraph 6(c) of OUH's contract with EPMC. Upon examination of the contract between EPMC and OUH, it is clear OUH lacks the authority to demand Plaintiff's removal and termination of contract, as the conditions outlined in paragraph 6(c) were not met. OUH was Plaintiff's joint employer, and used its power over EPMC to achieve the goals of Beavers. The actions were unjustified and constitute a breach of its agreement with EPMC by insisting on Plaintiff's removal and contract termination. EPMC, on the other hand, should have refused OUH's demands and continued to uphold its contract with Plaintiff. However, out of fear of retribution, EPMC acquiesced to these demands, despite knowing these demands were malicious and founded solely on falsehoods devised by Stefanie Beavers and Tracey Kiesau.

33.    Stefanie Beavers and Tracey Kiesau were unhappy with the recipients cc'd on Plaintiff's email sent on April 29, 2024. Additionally, they were angered that their new compensation plan was being challenged on both industry and legal grounds. OUH's proposed compensation plan for APPs is likely illegal.

---

[2] This was a threat from OUH. The quiet part is OUH is threatening to terminate Plaintiff's privileges. This was done
   to cause mental pain and harass Plaintiff. Given the facts and circumstances, OUH has not followed through on its
   threat.

34.    For this salary compensation plan to be legal, the APPs must be exempt from the salary-basis test. Simply put, this test evaluates whether an employee is truly compensated on a salary basis.  Compensation plans requiring an employee to complete a specific number of hours or achieve a certain number of shifts within a pay period are not salary-based.  These doctrines were addressed in *Belt v. Emcare*, 444 F.3d 403 (5th Cir. 2006), where the Court concluded APPs are indeed subject to the salary basis test.  The significance of the court's determination is APPs cannot be compensated with a salary while also being mandated to work a specific number of hours or shifts.  The court also determined APPs are entitled to receive overtime pay.

35.    OUH and its agents were aware that their actions were both intentional and outrageous and would inflict mental pain and anguish on Plaintiff.  It is egregious to fabricate and publish falsehoods to influence another company to terminate someone's contract and then further obstruct the hiring and rehiring of said person at both OUH and EPMC.

36.    OUH had Plaintiff blacklisted from EPMC.  These acts violate Oklahoma's Blacklisting statute.

37.    One who intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting from the failure of the third person to performance the contract, restatement (Second) of Torts, § 766.  OUH's conduct was deliberate and improper, resulting in EPMC's failure to perform its contract with Plaintiff.

38.    OUH is aware that EPMC is contracted exclusively with them.  By demanding EPMC terminate its contract with Plaintiff, OUH knew this would result in Plaintiff's

termination from EPMC. OUH actively prevented EPMC from employing Plaintiff and effectively blacklisted her from EPMC, a clear violation of Oklahoma law.

39.    EPMC, for its part, failed to clearly communicate the termination of her contract. They delayed for weeks before informing Plaintiff's counsel they would send separation agreements, which were unacceptable. According to Plaintiff's contract with EPMC, EPMC was obligated to provide ninety (90) days' notice to terminate the contract without cause. During this notice period, Plaintiff would continue to perform the duties of her contract and receive compensation. However, no such notice was given, and Plaintiff began suffering damages from EPMC's actions immediately.

40.    EPMC likely intended to terminate Plaintiff for cause. However, there were no legitimate grounds for such action, resulting in a breach of its contractual obligations with Plaintiff.

41.    EPMC has expressed that they did not wish to terminate Plaintiff's contract, but they felt compelled to do so out of fear of potential retribution from OUH. EPMC's sole source of revenue arises from OUH and its affiliated facilities.

42.    Moreover, agents and owners of EPMC have repeatedly acknowledged they know the allegations against Plaintiff are fabricated and continue to stand firm in their belief that Plaintiff's actions were not unprofessional.

43.    On information and belief, Plaintiff has been asked by other members of the professional healthcare community about the quagmire with OUH and EPMC. There has been no effort from OUH to conceal this information from other healthcare professionals.

44.    Plaintiff was also contracted as EPMC's lead APP.

45.    Per Plaintiff's contract, duties of the lead APP included facilitating communication between OU ED medical directors, EPMC leadership and management groups and all other OU APPs.

46.    Documentation exists implicating Dr. Michael Kalcich in the recruitment of Ms. Humphreys to act as a liaison between EPMC and OUH APP executive leaders during the negotiation process[3], as he reported he could not negotiate on behalf of the APPs based on instruction given to him by OUH legal[4].

47.    Dr. Michael Kalcich contributed to the drafting and oversight of all communication between Plaintiff and OUH leadership.  He provided Plaintiff with names of specific individuals to include on the email chain.  Additionally, Plaintiff received his approval prior to sending emails being sent.  Plaintiff trusted and relied on his assurance that the communication was appropriate to send.  Furthermore, Plaintiff depended on and believed his statement claiming he could not negotiate on behalf of APPs.  She relied on and trusted in his commitment to support her during the negotiations.  Furthermore, Dr. Michael Kalcich explicitly gave both verbal and written approval of the content of the two emails prior to their distribution, which Plaintiff relied upon.

48.    Dr. Michael Kalcich was presented and participated in every meeting with Plaintiff and OUH leadership.

---

[3] It is unclear why OUH legal would be giving legal advice to EPMC and Dr. Michael Kalcich, considering EPMC has its
   own   competent   legal   representation. This situation   raises   the question   of whether   OUH   did   advise Dr. Michael Kalcich.
[4] It is unclear why OUH legal would be giving legal advice to EPMC and Dr. Michael Kalcich, considering EPMC has its
   own competent legal representation. This situation raises the question of whether OUH did advise Dr. Michael Kalcich.

49.     Plaintiff acted under Dr. Michael Kalcich's direction, only with his confirmation, assurance and ongoing support that Plaintiff's conduct was neither inappropriate nor unprofessional.   However, by depending on Dr. Michael Kalcich's guidance and management of the communication, Plaintiff was damaged and suffered emotional distress.

## PUBLIC POLICY TORT

50.     Paragraphs 1- 49 are incorporated herein by reference.

51.     Oklahoma law recognizes a public-policy tort (*Burk* tort) for employees fired under the following circumstance: 1) "an actual or constructive discharge 2) of an at-will employee 3) in significant part for a reason that violates an Oklahoma public policy goal 4) that is found in Oklahoma's constitutional, stator, or decisional or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and 5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal." *Vasek v. Bd. Of Cty. Comm'res of Noble Cty.*, 2008 OK 35, ¶ 14, 186. P.3d 928, 932; see also *Burk v. K-Mart Corp.*, 1989 OK 22, 770 P.2d 24.

52.     Plaintiff was fired.

53.     Plaintiff was an at-will employee.

54.     Plaintiff's termination violated Oklahoma's clear statutory and regulatory policy against misclassification of employees.

55.     No statutory remedy exists that is adequate to protect the Oklahoma policy goal.

## TORTIOUS INTERFERENCE WITH CONTRACT AS TO OU HEALTH

56.     Defendant OUH did not have privity of contract with Plaintiff.  OUH was aware of Plaintiff's contract with EPMC and maliciously and wrongfully interfered with Plaintiff's exclusive contract. This interference was neither justified, privileged, nor excusable.  As a

result of OUH's malicious, tortious, intentional, and outrageous conduct, Plaintiff suffered monetary damages, lost wages, and experienced mental pain and anguish.

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
## AS TO STEFANIE BEAVERS AND TRACEY KIESAU

57.    "It is fundamental that an employee or agent must act in good faith and in the interests of the employer or principal.  If an employee acts in bad faith and contrary to the interests of the employer in tampering with a third party's contract with the employer, we can divine no reason that the employee should be exempt from a tort claim for interference with contract." *Martin v. Johnson*, 1998 OK 127, ¶ 32, 975 P.2d at 896-897.

58.    Stefanie Beavers and Tracey Kiesau can be sued individually for interfering with Plaintiff's long-standing relationship with Dr. Michael Kalcich and EPMC.  The actions of Stefanie Beavers and Tracey Kiesau have damaged that relationship beyond repair and forced Plaintiff to bring this case against all Defendants to protect the her interests as well as the interests of current and future employees who could be subject to this behavior.

59.    Stefanie Beavers and Tracey Kiesau deliberately lied about Plaintiff to EPMC, deliberately sought out her removal, and were the sole cause of the Plaintiff's termination from both OUH and EPMC.

## MALICIOUS WRONG AS TO OU HEALTH, STEFANIE BEAVERS AND TRACEY
## KIESAU

60.    Oklahoma has long recognized the tort of Malicious Wrong. *Ward v. First National Bank*, 1937 OK 449, 180 Okla. 395, 69 P.2d 1041.

61.    A Malicious Wrong occurs when "the intentional doing of that which is calculated in the ordinary court of events to damage, and which does, in fact, damage another, or that other person's property or trade is actionable, if done without just cause or excuse.  Such

intentional action when done without just cause or excuse is what the law calls a malicious wrong." (emphasis added.) *Mangum Electric v. Border*, 1923 OK 547, ¶ 9, 101 Okla. 64, 222 P.1002, 1005.

62.     Malice is the essential ingredient of the tort of Malicious Wrong. Malice is defined by the Oklahoma Supreme Court as "intentional doing of a wrongful act done intentionally without just cause or excuse." *Id.*

63.     Malicious Wrong largely involves damages to contract and real property.

64.     Stefanie Beavers and Tracey Kiesau acted with malice toward Plaintiff. They forced Casey Woods to write a letter to EPMC demanding Plaintiff's removal knowing that the allegations contained in the letter were false and defamatory. There was no just cause or excuse for their actions.

65.     As a result of these actions, EPMC terminated its relationship with Plaintiff.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO OU HEALTH

66.     Defendant OUH and its agents deliberately and maliciously made false statements about the Plaintiff to secure her termination and ensure she was blacklisted from EPMC. In addition, Plaintiff was fired to protect an illegal salary compensation plan. Their conduct was extreme and outrageous, strategically designed to humiliate Plaintiff. These deliberate actions were intended to inflict severe emotional distress, which resulted in Plaintiff's considerable emotional suffering as a direct consequence of OUH's malicious conduct.

## BLACKLISTING IN VIOLATION OF 40 O.S. § 172 AS TO OU HEALTH

67.     40 O.S. § 172 provides "No firm, corporation or individual shall blacklist or require a letter of relinquishment or publish, or cause to be published, or blacklisted, any

employee, mechanic or laborer, discharged from or voluntarily leaving the service of such company, corporation or individual, with intent and for the purpose of preventing such employee, mechanic, or laborer, from engaging in or securing similar or other employment from any other corporation, company, or individual."

68.    In anticipation of OUH arguing Ms. Humphreys was not an employee, 40 O.S. § 165.1 defines "employee" as follows: "Any person permitted to work by an employer." "Employer" is then defined as: "Every individual, partnership, firm, association, corporation, the legal representative of a deceased individual, or receiver, trustee or successor of an individual, firm, partnership, association, or corporation employing any person in this state."

69.    OUH issued a letter on its official letterhead to EPMC demanding the Plaintiff's termination. Additionally, OUH has obstructed the Plaintiff's rehire at EPMC and has denied her the opportunity to be hired at OUH facilities.  These actions violate Oklahoma law, particularly when OUH sends a letter to another company (EPMC) demanding Plaintiff's termination.  Moreover, OUH continues to violate Oklahoma law by preventing her rehire at EPMC.  The violation was further exacerbated when OUH indicated Plaintiff was eligible to work at OUH, despite having blacklisted her from employment.

70.    40 O.S. § 173 provides: "Any person, firm, or corporation violating the preceding section shall be fined in any sum not less than One Hundred Dollars ($100.00) nor more than Five Hundred Dollars ($500.00), and any person so blacklisted shall have a right of action to recover damages."

71.    By its own admissions and actions, OUH has blacklisted Plaintiff, displaying a reckless disregard for Plaintiff's rights.

72.     Due to the outrageous conduct of OUH, Plaintiff has been blacklisted from both EPMC and OUH. As a result, Plaintiff has suffered damages including lost wages, lost opportunities, emotional distress, and mental pain and anguish.

## BREACH OF CONTRACT AS TO EMERGENCY PHYSICIANS OF MIDWEST CITY

73.     EPMC had an employment contract with Plaintiff. The termination clause provides in pertinent part: "either party may terminate Employee's employment at any time without cause, upon delivery to the other party of written notice of such termination not less than ninety (90) days' prior to the effective date thereof."

74.     EPMC, by its own admission and assertions, had no justification for terminating Plaintiff's contract. However, due to their exclusive contract with OU, Plaintiff was constructively terminated. EPMC breached its obligation to provide ninety (90) days' notice of termination to Plaintiff. EPMC conveyed to Plaintiff that the termination was against its own wishes. EPMC sought to bypass its contractual and financial obligations with Plaintiff. No formal termination was ever carried out, and Plaintiff did not receive a written notice that would fulfill EPMC's contractual obligations. Despite the contract being drafted on EPMC's letterhead and composed to strongly favor EPMC, the company still neglected to fulfill the basic obligations outlined in its own agreement.

75.     To terminate Plaintiff without cause, a ninety (90) days' notice period was required. However, no notice was provided, leading to Plaintiff incurring contractual damages, including lost wages and mental pain and anguish as a result of the breach.

## PUNITIVE DAMAGES TO OU HEALTH

76.     The conduct of all defendants exhibits a blatant disregard for Plaintiff's rights, particularly as OUH deliberately and willfully violated Oklahoma. Further, OUH has violated

federal law, and DOL regulations. The OESC works with DOL to enforce the FLSA and DOL regulations. OUH engaged in outrageous and intentional conduct by fabricating lies about Plaintiff to ensure her constructive termination from EPMC. They intentionally interfered with and disregarded the longstanding contractual relationship between EPMC and Plaintiff, resulting in Plaintiff's termination that was based on a series of malicious falsehoods, devoid of any valid justification.

77.     OUH made a false and defamatory statement about Plaintiff.

78.     OUH reasonably understood the statement to be about Plaintiff.

79.     OUH's statement was only susceptible of one meaning, a false and improper one.

80.     OUH's statement was unprivileged.

81.     OUH published its statement to Dr. Michael Kalcich, Dr. Michael Padgham, and EPMC.

82.     On information and belief, these false statements have been shared with other physicians, PAs, NPs, and RNs around the Oklahoma City metro area.

83.     OUH terminated Plaintiff in violation of Oklahoma public policy.

84.     OUH's actions toward Plaintiff demonstrate a reckless disregard of Plaintiff's rights.

85.     OUH's actions were done with malice. OUH knew the statement was false when OUH published it.

86.     OUH's actions exposed Plaintiff to public and private ridicule.

87.     Plaintiff has suffered financial loss, damage to her reputation, and emotional injury.

88.    Plaintiff was terminated as a direct result of OUH's statement, causing abhorrent financial, reputable, and emotional injury.

89.    OUH's statement was the proximate cause of Plaintiff's harm.

## CONSTRUCTIVE FRAUD AS TO DR. MICHAEL KALCICH

90.    Dr. Michael Kalcich owed Plaintiff an equitable duty to disclose material facts. As CEO of EMPC, Dr. Michael Kalcich was in a better position to understand the parties involved in the merger transaction, how they operate, and how they react in certain circumstances. He was in a better position to voice departmental concerns and negotiate compromises as CEO of one of the dealing parties.

91.    Dr. Michael Kalcich negligently misrepresented material information to Plaintiff. Dr. Michael Kalcich negligently misrepresented that only Plaintiff could communicate departmental concerns to OUH and that she would not be retaliated against for voicing them, instilling a false impression of communication requirements and job security.

92.    Dr. Michael Kalcich concealed material facts which he was obligated under the circumstances to disclose to Plaintiff. He concealed that Plaintiff was not the sole individual capable of communicating departmental concerns to OUH and that she would likely be retaliated against for communicating concerns.

93.    Plaintiff had a right to expect disclosure of material facts that would directly affect her employment rights.

94.    Dr. Michael Kalcich breached his owed equitable duty to Plaintiff by misrepresenting material facts to Plaintiff, instilling a false impression upon her, and failing to disclose material facts he was obligated to disclose.

95.    Dr. Michael Kalcich's breach misled Plaintiff to her prejudice. Plaintiff lost her contract as a direct result of his breach.

96.    Dr. Michael Kalcich gained an advantage by misleading Plaintiff to her prejudice. He allowed someone, other than himself, to be placed in the crosshairs in order to continue the acquisition without retaliation against him.

97.    Plaintiff has suffered harm as a proximate result of Dr. Michael Kalcich's breach.

### VICARIOUS LIABILITY AS TO OU HEALTH

98.    Stefanie Beavers, Casey Woods, and Tracey Kiesau are, upon information and belief, agents and employees of OUH.

99.    As such, OUH may be held vicariously liable for their tortious conduct taken within the scope of their employment.

100.    Stefanie Beavers, Casey Woods, and Tracey Kiesau's tortious conduct was undertaken within the scope of their employment. All relevant communications by them regarding Plaintiff were directly within the scope of employment.

101.    Therefore, OUH may be held liable for Stefanie Beavers, Casey Woods, and Tracey Kiesau's tortious conduct.

### VICARIOUS LIABILITY AS TO EMERGENCY PHYSICIANS OF MIDWEST CITY

102.    Dr. Michael Kalcich is, upon information and belief, an agent and employee of EPMC.

103.    As such, EPMC may be held vicariously liable for Dr. Michael Kalcich's tortious conduct taken within the scope of his employment.

104.    Dr. Michael Kalcich's tortious conduct was undertaken within the scope of his employment.

105.    His communication with Plaintiff was directly in line with his role as CEO of EPMC, and therefore within the scope of his employment.

106.    Therefore, EPMC may be held liable for Dr. Michael Kalcich's tortious conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants for an amount in excess of $75,000.00, together with attorney fees, costs, interest and all such other relief this Court deems equitable, just and appropriate.


Respectfully submitted,


Blair S. Hollaway, OBA No. 30356
BLAIR LAW
617 S. Air Depot Boulevard
Midwest City, OK 73110
Telephone: (405) 818-1837
Facsimile: (405) 467-1811
blair@blairlaw.com